Next is Sam. Sam Louie v. Bay Institute Would appellant's counsel please approach the podium and proceed? I can't hear a word you say. I apologize, your honor. There are two sets of appellants here today. We were wondering if the court would like to provide guidance as to which it would prefer to hear from today first. Oh, you have not arranged that among yourselves? I believe the counsel is stipulating that the environmental appellants will go first today, your honor. Well, if you stipulate it, then you don't need to ask me. No, no, just at this moment. I'm sorry. May it please the court, I'm Cynthia Kohler, here for the Environmental and Fishing Organization Appellants. The clear and unambiguous intent of Congress in Section 346B2 was to reallocate a specific amount of federal reclamation water back to fish and wildlife each year, and to do so for the primary purpose of implementing new restoration mandates. The district court's holdings frustrate this intent. Turning first to the primary purpose issue, the lower court held that Interior must use the 800,000 acre feet first to fulfill all of the CDP's obligation under other environmental statutes, and need not retain any of that water for the primary purpose of the dedication. This misconstrues the law in three ways. First, it ignores Congress's expressed use of the term primary purpose. According to Asgrove's seed and cases in this circuit. Counsel, doesn't your argument substitute sole for primary in the legislation? Not at all, your honor. Why not? We recognize that primary, because our argument is that most of the water, the bulk or preponderance of the water, must be preserved for the restoration mandates of the CVPIA. We have never made the case that that water can only be used for those mandates. Okay, so when you say most, are you saying 51% of the water must be used for that purpose? That is the argument. Okay, and what's your best case authority for that proposition? In Asgrove's seed versus Winter Bar, the Supreme Court case from 1995, the court held that the term primary farming occupation as used in a federal statute refers to the bulk or preponderance of that farmer's business. Counsel, in that case, was there a list of uses as there is in this statute? In the statute, there was a primary use articulated, but there were also additional uses. So if we are to construe the statute as a whole, how do we do that without negating the other language in the statute? To answer your first question, there was not a list of other purposes in the statute at issue in Asgrove. However, I don't think that is determinative here, because the answer to your second question, how to construe the statute, is to give effect to primary, is to require the agency to preserve most of the water, as you put it, 50%, for those primary purposes, and the use can be allocated among the other purposes of the Act. But Congress's expect term indicates that it must be given effect. In this Court's case, in Ray Kelly, the Court constrained another statute using this term in tax code. The specific use of the term primarily in the Act, which is in Section 34.02, which talks about the purpose title without giving any primacy to any of them. Act as a whole. Yes. That is general language that is specific to the primary purpose of the dedication. For many purposes. Section 4.6.b.2 allocates the 800, very specifically, to the dedication mandates. The CBPIA is there. Your argument goes a little bit into the decision. You're saying that the primary purpose really requires that more than to the dedication. I'll go to the first purpose. But the question may be whether the Secretary would be compelled to allocate more than half of the water to the primary purpose. It's whether the Secretary can decide to allocate more than half of the water. A little different. I mean, in other words, we don't have a case before us where the Secretary had to allocate to other uses. That is the case here. So it's whether allocates less than half and more than half of the water to the primary purpose. I would agree, Your Honor, except that in the law. Well, I understand why you're arguing that. But in the decision, you don't need to prove that the primary purpose. You know that law permits the Secretary to decide that more than half would go to the primary purpose. That's correct. I realize that that written into a decision wouldn't be as much as you want. That's correct. The reason that we believe the primary correct is because insurers are already able to meet, to use CVP water to mission under a standard specialty. So we don't have to allocate more than half of the water from the CVP to accomplish that purpose. The second reason why we believe that reinforcing the primary clause to be given specific. Let me comment briefly on something that precedes this logically. Since the district court remanded for further accounting, and since the outcome of the case is likely to be somewhat equitable, it is not accomplished until that accounting is done. Since I would think we could review it. Why isn't jurisdiction over this interventory? The lower court's ruling is a judgment for three reasons, Your Honor. First, there really was no remand. The lower courier, to implement its ruling, the decision. What the ruling says? Yes. In the past. The final decision states that the decision that the act should be remanded, implemented in 2000 and in 2001 for further action. It then went on and issued a rule of partial final judgment, which is a reason for delay. Isn't it still up there? Absolutely. That is in the discretion of this court. However, this court's precedent is a considerable deference to the lower court on this. Arguing in the argument is that the district court is internally in conflict with itself. The judge made very detailed findings in three separate rulings on why these issues on account of completely remanding would be acquiring erroneous rulings that would process again. This is not a situation. The application is necessary to reach the issues that we are aware the lower court has. The third reason that this is the demand that is because ask a corporation to be Lujan applies, holding that remanders. In this case, there is a severable legal issue. And review is otherwise foreclosed. Factors. And for those reasons, we feel jurisdiction. Moving on to which is crediting. The court. Thank you. First, I think it's thirty four or six. B one C requires the project vision to water quality to to quote the best extent practice. Nicely. You asked me what that means. That seems to say that is up one hundred percent. You are in our opening brief. And the way that we see that those two situate those two provision to be reconciled is that stand. Requirements are dutif of those two. To restore an agonist fish salmon. That extent, they should be credited. Sorry. If there is a choice of account, you can afford under the B two. As long. Shown in this case. Terms are in general. Because Congress, again, as we Congress didn't need to set aside an allocation to ensure that the Central Valley. It already had cases for Valley. To meet control plan standards. So those counsel. Well, the clean end. The holding in S.V. versus control board established that the Central Valley project is subject to or to meet the state. It didn't have. I mean, in terms of the allocation of feet. No, I'm sorry. Is that Congress? That was a 1986 statute. The card in 1986 case actually referenced in was aware a project. Water quality standards. But I thought you argued that there was no need to enact the statute of issue here because of that prior obligation. Precisely. But it's true. Articulation of acre feet requirement be included. Then if that was already in. That's exactly our point. Your location. Was primarily to meet the school restoration C.V.P.A. itself. The C.V.P.A. requires their double fish populations in ten years. The primary purpose of foot allocation was to meet statutory debt clear not only in section 3406, but again in 3406 it specifically directed interior to use that dedicated. Primarily based on your interpretation of that word. Precisely. Okay. Precisely. The district courty count is that term, can be charged for withdrawals of water from the Central Valley project, but cannot be credited for deposits of water back to the project. This interpretation is incorrect. First, it eliminates the express distinction that Congress drew between the reallocated water in section 3406B2 and changes in project operations that do not have any cost, any water cost to the project specifically authorized in section 3406B1. The district court held as a matter of law that any time water passing through the project provides any sort of benefit to fish, this must count as a dedication of yield even when there is no cost, no water cost to the Central Valley project. This clearly frustrates Congress' intent and its express mandate to reprioritize how C.V.P.A. projects are allocated. Counsel, what language in the statute are you relying upon to support your position that the credit determination by the court was erroneous? What language are you relying upon? Section 3406B1 provides that interiors authorized to direct to modify project operations to provide flows of suitable quality, quantity, and timing to protect all life stages of fish, except that such flows shall be provided from sources which do not conflict with the Secretary's contractual obligations to provide C.V.P. water for other authorized purposes. Okay, and you're interpreting that language to say what? Our interpretation, which is consistent with Interior's interpretation for many years, is that that language refers to changes in the way the project is operated that provides benefits but does not reduce the amount of project water available. The example we used in our brief, Your Honor, is that these are basically timing changes. Fish can derive significant benefits because water is released at different times. Those timing changes don't necessarily amount to a reallocation of water from consumptive uses, from its other authorized uses, to the environment. Does that answer your question? I understand your argument. Thank you, Counsel. I guess I used up all my time. Good afternoon, Your Honors. I think that Judge Kleinfeld has asked what has to be the principal question, and that is whether or not this Court has jurisdiction to consider the issues on this appeal. On Friday, the Department of the Interior issued, in final form, a new decision concerning how Section 3406b-2 will be implemented. A copy of that new decision was filed with the Court, along with a notice of facts that raise a question of mootness. We understand, Your Honors, that it is our obligation to bring to the Court's attention facts that may render this appeal moot. And it is our view that because all of the claims that were considered by the district court pertain to the October 1999 decision, which has now been superseded by the decision, the final decision issued on May 9th, 2003, the issues on this appeal are moot. To what degree was the new decision constrained by the action of the district court? It was constrained, Your Honor, in a number of respects, but not all respects. And I think that the critical observation is that in response to comments from the environmental appellants in this case, that the Secretary should defer adoption of a new decision pending a decision by this Court, the Department of the Interior stated, and I will quote, Interior disagrees. Interior believes that finalizing the revised decision at this time is an appropriate exercise of the Secretary's discretion. So the Secretary of the Interior has exercised her discretion to adopt a new decision. And admittedly, if anyone contends that that new decision goes beyond the authority of the Secretary to set forth in the statute, then a party would be free to challenge that new decision. But the adoption of the new decision means that the controversy that is before this Court is no longer alive. Counsel, I didn't hear the answer to the question regarding how the new decision differed from the mandate from the district court. What things were in the new decision that differed from the remand order of the district court? Well, the district court's decision dealt with issues concerning limitations on the amount of water used for Endangered Species Act purposes. The accounting issues. Yeah, the accounting issues. But there are other issues that are in the new policy that were not addressed by the district court. As an example, the new policy establishes that a new shortage criteria that will be employed to determine when the 800,000 acre feet will be reduced, that is an issue that was never addressed by the district court. Is that an accounting issue or not? It is not an accounting issue, Your Honor. But there is a change in policy that does relate to accounting, and that is that Interior will dedicate an upfront 200,000 acre feet for what can be characterized as discretionary B-2 uses. And so the new policy does modify the way in which Interior will account for water used under B-2. I guess the reason I asked was that the way the approach seems to be, well, don't decide this appeal now because there was a remand. And the argument on the other side is, yes, but if the remand contains directions that are legally erroneous, it may save a lot of time and trouble if those are straightened out so that the remand can follow the correct law if we indeed decide that the district court made a mistake. But now you're saying, well, we went back on the remand and we did what the district court told us to do, and therefore don't review what the district court did. Your Honor, the question is going to be, how many times should this court decide the substantive issues in this case? And theoretically, the court could decide to exercise jurisdiction to decide issues that were decided by the district court, although that, as I indicated, that controversy is no longer alive because the policy, which was the subject of the district court's decision, has been superseded by a new policy. And to the extent that that policy represents the exercise of discretion by the secretary, anyone interested in challenging that exercise of discretion should do so in the district court so that the decision of the district court can be supported by a new record. Counsel, would you agree if the new final decision tracked the remand order perfectly, would you agree that we had jurisdiction at that point? I'm not sure I can answer that question, Your Honor, because the point is it does not track. But if you assume, for purposes of my question, if we disagree with you regarding whether or not the new final decision tracked the remand order, would you lose your argument on mootness? To the extent that the exercise of discretion, the secretary's discretion, well, the answer, Your Honor, is. Excuse me. If the secretary exercised his discretion to comply with the mandate for the district court, would that render the case moot? Yes, Your Honor. And why? Because in this case, the secretary and the United States determined it would not appeal the decision. And it has complied with the order of the district court and has said in the exercise, the secretary has said in the exercise of my discretion, this is how I am going to implement the law. Now, there may be some issues pertaining to the new decision, which the district court could decide in a new case, that may be substantially the same as the issues that were raised by this appeal. But the policy that was the subject of that action is no longer in effect. It has been superseded. There's another issue that I would like to turn to on the merits, in case you do determine that the court has jurisdiction. And it relates to the question that was raised by Judge Rollison, and that is with respect to the language of primary purpose in Section 3406b-2. Ms. Kohler, on behalf of the environmental appellants, asserts that that language means that a preponderance or a majority of the 800,000 acre feet must be used for implementing the fish, wildlife, and habitat restoration purposes authorized by the Act. But if you listen to the argument carefully, they would limit the fish, wildlife, and habitat restoration purposes of the Act to mean the anagramous fish doubling goal of Section 3406b-1. And as Judge Rollison's questions pointed out, there are other fish, wildlife, and habitat restoration purposes of the Act and, in fact, Section 3406b includes among the authorized fish, wildlife, and habitat purposes of the Act, meeting, and I'm quoting here, meeting all obligations under state and federal law, including but not limited to, the Federal Endangered Species Act and all decisions of the California State Water Resources Control Board establishing conditions on applicable licenses and permits for the project. Those are among the fish, wildlife, and habitat restoration purposes of the Act. Ms. Kohler said, but it wasn't necessary for Congress to set aside yield for those purposes because the project was already obligated to meet the requirements of the Endangered Species Act and the Clean Water Act. Well, Your Honors, I would submit that that is not quite as clear as Ms. Kohler would have this Court believe. For instance, there will be cases that reach this Court coming out of the Klamath Project concerning the obligation of the Klamath Project to use appropriated water to comply with biological opinions under the Endangered Species Act. At the time CVPIA was enacted, there was a great controversy concerning the obligation of the Central Valley Project to comply with decisions of the State Water Resources Control Board. And what Section 3406B represents is a judgment by Congress that the project would meet the requirements for obligations imposed under the Endangered Species Act and would meet obligations imposed under the Clean Water Act by the State of California. Well, Counsel, then why do you suppose Congress used the phraseology primary in describing the first purpose? Because, Your Honor, what Congress was trying to say through the use of primary purpose was that the water could be available for other purposes. If the Court looks at the legislative history of the Act, when the section that ultimately became Section 3406B2 was first considered in the House of Representatives and this is Section 6 of H.R. 5099, the language said, Upon enactment of this Act, assign 1.5 million acre-feet of project yield for the primary purpose of implementing the fish, wildlife, and habitat restoration purposes and measures authorized by this Act. It didn't mention meeting the requirements of the Endangered Species Act and it didn't mention meeting new obligations imposed under the decisions of the State Water Resources Control Board. So when the bill went to conference, but let me answer your question specifically. So Congress said, Use the 1.5 million acre-feet of project yield for the primary purpose to indicate a congressional intent that once the water had been used for environmental purposes, it could be used for other purposes as well. For instance, once water has been released from a reservoir to increase flow for the benefit of fish, it can be re-diverted downstream in the delta so that it can be used again for irrigation purposes. Primary purpose was inserted to make it clear that the water, once it had been used for fish, wildlife, and habitat restoration purposes, could be used for other purposes. Then the question becomes, well, why did Congress insert the language to assist the State of California in its efforts to protect the waters of San Francisco Bay and the delta and to help meet such obligations as may be legally imposed upon the CVP under state or federal law following the date of enactment of this title, including but not limited to additional obligations under the Federal Endangered Species Act. That language was added in conference to make it clear that, or to express a congressional intent, that new obligations imposed under the Endangered Species Act and new obligations that might be imposed by the State Water Resources Control Board would be counted toward the 800,000 acre feet as opposed to being additive to it. Now, if you look at the legislative history, there are many statements that come out from members on the floor when the conference report was being considered by the respective houses. And Ms. Kohler, in her brief, points out, well, those were opponents of the original bill, but this was a compromise, and that's exactly what those members said. This was a compromise. If we were to take the case without legislative history to actually look at the law that was passed rather than what to me would be idle chatter about the preferences of various individuals who were members, is your definition of primary purpose something like the purpose to be served principally but not exclusively of others? I have two responses to that, Your Honor. The first is that by using the word primary, Congress did not mean solely for this purpose. But beyond that, and I think this is critically important, when the environmental plaintiffs were commenting on the draft decision that was finally issued in October of 1999, they made the comment that's very similar to the argument made in this court, that Interior has to use a preponderance or a majority of the water for the fish doubling standard in Section 3406B1. And Interior made the following comment, and, Your Honors, this is at excerpt of Record 01041, and I don't expect that you have it here because its volume is high, but Interior made the following comment. It should be noted that the Delta Water Quality Control Plan includes standards that promote restoration of certain fish. So the Water Quality Control Plan adopted in 1995 included as part of its Water Quality Control Plan objectives measures to restore fish. Counsel, before you conclude. That's not by this Act. In other words, the primary purpose refers to the fish restoration. That's the purpose of this Act. And what the State did doesn't necessarily fall in that, does it? No, Your Honor. The primary purpose, and this is critically important, the primary purpose is not, despite what environmental appellants would have the court believe, if you look at the language of the statute, it says, the primary purpose is for implementing the fish, wildlife, and habitat restoration purposes and measure authorized by this title. Now, my purpose in referring to what Interior said about the Water Quality Control Plan was that Interior did what it was directed to do under Section 3406B1C. It consulted with the State of California in developing these new Water Quality Control Plan standards for the Delta to say we want to use water that will be dedicated under B2 for Water Quality Control Plan purposes. In fact, if the court were to look at excerpt of record at 01020, the 450,000 acre foot cap that was in the policy was based upon Interior's analysis that the 450,000 acre feet would be needed to meet the fishery requirements of the Water Quality Control Plan. So if, in fact, the statute required that a preponderance of the water or a majority of the water be used for those purposes, using it to meet the Water Quality Control Plan standards was in furtherance of that because under that plan 450,000 acre feet would be used for fishery purposes. Not necessarily fishery purposes authorized by this title, but for fishery purposes. Oh, no, no, no. In fact, Your Honor, there are fishery purposes authorized by this title because if Your Honor were to look at Section 30, what I would encourage the court to do is to look at the basic purposes of the act set forth in Section 3402 and then look at the more specific language contained in Section 3406A, which specifically amends the authorizing statutes pertaining to the operation of the CVP. And then 3406B, and not B2, Your Honor, but 3406B, where Congress said, The Secretary, immediately upon enactment of this title, shall operate the Central Valley Project to meet all obligations under state and federal law, including but not limited to the Federal Endangered Species Act and all decisions of the California Water Resources Control Board establishing conditions on applicable licenses and permits for the project. So those were among the fish and wildlife purposes, and if Congress didn't need, as Ms. Kohler suggests, if Congress didn't need to say the project will be operated in this particular manner, then why did Congress say it in Section 3406B? Counsel, I had one final question before you conclude. How does our case authorities such as Kohler affect your argument on remand? We appear to say that a remand does not affect the finality of a decision. Could you just briefly tell us how that affects your argument? Your Honor, frankly, I think that if this Court wants to decide this case based upon the record that's before it, you could find authority to support the decision to decide it. On the other hand ñ That's what I want. That's what I thought we had said previously, that a remand does not negate the finality of decision. But, Your Honor, what the Court said, the Court listed a number of factors in Kohler, and I am not sure that any of those factors apply in this case. Beyond that, Your Honor, I don't believe that declining to exercise jurisdiction in this case is going to prevent any party from having their issues ultimately determined with respect to the new policy in the district court. I understand, Your Honor. And then ultimately by this Court. I understand, Your Honor. After a final judgment. Thank you, Counsel. Thank you very much, Your Honors. May it please the Court, I am David Shulton, representing the federal appellees. With me at counsel table is Alf Brandt from the Department of Interior Solicitor's Office. I want to speak first to the jurisdictional issue and the effect of the remand. The remand from the district court does put some limits, certainly on what Interior can do with its new accounting decision. It puts some constraints on Interior, but at the same time leaves a fair amount of discretionary decision-making to the agency in coming up with its new decision. The order says that we can't use certain concepts and we can't set a limit at 450,000 acre feet. But in coming up with a new accounting decision, Interior has to figure out how it can maintain the statutory purposes and still abide by those limits. And in doing that, it has to make discretionary decisions. As Mr. Birmingham mentioned, one of those is that, well, we'll set a 200,000 acre feet target for the beginning of the water year from October to January, and we will target 200,000 acre feet for fishery purposes then. That's an important time to do that. Now, in the comments that we received on the draft decision that are included in the final decision that you now have before you, the water users took strong issue with that point. They said, well, if you target 200,000 acre feet at the beginning of the year, how do you know you won't use more than 600,000 acre feet for Water Quality and Endangered Species Act purposes later on? We don't like that. There are other discretionary determinations that have to be made about what kind of metrics the agency will use. In the 1999 decision, there were three metrics. In the current decision, there are two. There are some aspects of the decision that the environmental plaintiffs have complained about, the shortage provisions. And so my point is that while there were limits placed on what Interior can do by the judge's decision, there were a lot of discretionary matters that people are likely to complain about before Judge Wanger when challenging this decision. And so we think that in line with this court's decisions in Oliska versus Andrus and similar cases, that a remand like this is not a final judgment from a district court and that, accordingly, this court doesn't have jurisdiction. Now, we don't really see it as a mootness issue. In fact, we think that the issues that are being raised here about the legal limits that come from the statute can be raised when Judge Wanger reaches a final decision when he reviews this new accounting decision. We don't think that anybody is going to be precluded as an effective matter from bringing their claims and bringing their appeal at that time. And so because of that, the plaintiffs, the appellants, can't meet the three-part test that's in Collard and in Chugach, which requires not only that they show that there's some conclusive legal issue that will be applied in the remand, but also that they are precluded as an effective matter from raising that in an appeal from the final judgment when it does become final. And I don't think they are precluded, that the exception that Collard notes has been applied where the agency has appealed from a remand order. And that's simply because an agency, as a practical matter, can't appeal later on from its own decision on remand. I suppose the question is, if someone, if we were to determine that this appeal is premature, basically, it's what you're arguing, really. It's a premature appeal, and you can preserve all the objections there. No decision is contested. Will the people who challenge it then be met with the argument that, well, you're saying, for instance, that the district court was wrong in saying that 800,000 feet of wet water basically was an upper limit. You couldn't use any more than that. And they'll be met with the argument, well, yeah, but now the secretary has elected not to use more than 800,000. So it doesn't really have anything to do with the district court anymore. Well, you know, I think that the water authorities are making some presumptions about what Interior would or would not have done absent the district court's order, which I don't think can really be made. I mean, it's true we did not appeal. But, you know, I don't think that necessarily follows that, you know, that everything that Interior is doing on this remand is, you know, on its own and not influenced by the district court's decision. But I think if this court dismissed on jurisdictional grounds, it certainly could make clear that all of these issues would be open on the next round. It seems only fair that they would be open on the next round. The environmental plaintiffs have argued that the remand order here was limited to recalculating accounting for the water years 2000 and 2001. I think that's incorrect. I mean, for one thing, even if it was a limited remand just for those, it's still a remand. But I think that's based on a misreading of the order. The order says remanded the decision on implementation of the CBPIA as implemented in water years 1999 to 2000, 2000 to 2001. And the reason for that is that some of the policies that were at issue, especially the offset and reset policies, really only became clear when they were implemented in those two years. I think it's plain that the district court simply wasn't sending it back for a recalculation of the accounting, which had happened in those two years. Those years are over. There would have been no point to that. I think clearly the district court's remand was to the agency to come up with a new accounting decision, taking into account, if you will, the legal limits that the district court had announced. And that seems to us to be not a final decision. It's true that, as the environmental plaintiffs point out, that the district court seemed to be saying that you would like some guidance from this court on some of the issues that were raised. But I think it's a matter of appellate jurisdiction that the only proper way to get guidance on particular legal issues is a 28 U.S.C. 1292B appeal, and that's not this appeal. And I'm not sure that it would have been proper as a 1292B appeal anyway, because I'm not sure that the issues were actually conclusive. This is a 54B appeal, and for a 54B appeal, while a district court is authorized to enter a final judgment upon making a finding, it has to, in fact, be final. And this court's decisions in cases like Zucker v. Maxicare say that a court cannot convert a non-final decision to a final one simply by doing a 54B order. We're not contesting about the discretionary decision about, you know, whether in the interest of justice and so forth that the district court made. Our argument is simply that this was not final. If the court does reach the merits, we have taken the position that those aspects of the district court's order, which affirmed aspects of interior's decisions, were correct. There are essentially two of them. The first one has to do with the water authority's appeal as to whether you have to look back to the 1928 to 1934 period to calculate how much you charge the B-2 account for particular B-2 actions. This is one of the many areas where Congress simply did not speak to how you do the accounting. The water users have argued that Congress directly spoke to the issue in Section B-2 when it required Interior, upon enactment of this title, to dedicate and manage annually 800,000 acre feet of Central Valley project yield and then later in the section define CVP yield by reference to the delivery capability of the project during that 1928 to 1934 drought. But that simply defines the pool out of which the 800,000 acre feet is to come, which is the delivery capability of the project under extreme drought conditions. It doesn't say anything about how the individual actions count against the 800,000 acre feet. What is the difference between saying yield and saying water? Well, actually, Congress in Section B-2 in a number of instances went back and forth. In places they talk about 800,000 acre feet of CVP yield. In other times in B-2A, they simply say such quantity of water shall be in addition to the quantities needed to implement Paragraph 3406 and such quantity of water. See, I wondered if it had any relevance to the offset reset theory, that you're using water but not yield when you take water off the top of a reservoir that refills itself. I don't think so. And, of course, we have not appealed on the offset reset point. But I think the main point here is that when Congress talked about CVP yield in this section, it was simply identifying the pool that this 800,000 was to be taken out of. And it wasn't requiring every time we take an action, say, to release water for fish to raise the level of a river, we don't have to pretend that we're back in that 1928 to 1934 period. So what's the significance of that reference to that drought period? If severe drought restricts the water to the flow that it had back in 1928, they're still entitled to their 800,000 feet. Absolutely. Congress wanted to make it clear that this pot of water, 800,000 acre feet, was always going to be there. And so that's why they defined it in terms of the historic. Then there's a separate provision for reduction in some cases. There is, yes, a separate provision for as much as a 25 percent reduction in hydrologically dry periods. And then the other issue is simply whether water can be reused after it's already served one B2 use. And I think we'll just rely on our brief for that. Would that have caused an offset when a traditional agricultural water user gets to use the water too? No, I don't think under Interior's 1999 decision that would have had any effect on the accounting. Once it's used, say, upstream to raise the water level of a stream, it gets counted there. But if it's used downstream by a farmer, it just has no effect on the accounting at all. So that's not part of the project accounting? Right. It's a downstream diversion? It's downstream. Now, if Interior decides as an initial matter that it's going to release water from an upstream reservoir for the purpose of having it flow through the delta to help the fish in the delta, it can do that and it can designate that water as B2 water all the way down. It has the discretion, certainly, to do that. But where it designates the water simply as B2 water to help in the upstream fishery, then once it's fulfilled that use, it can be used by other water users. Unless there are questions. Thank you very much. Thank you, Council. I have used up all my time. I'll tell you what. The government stayed within its time, but I know that you're adverse to the other appellant, the water authorities, and they went over time, too. Why don't you take 60 seconds? Thank you very much. I appreciate it. First, regarding the primary purpose issue and its interplay with the Water Quality Control Plan, two things are clear from the statute. Congress did want the CVP to comply with Water Quality Control Plan requirements, but it also wanted to establish a new allocation of project water to achieve. That is the word of Section B1, the salmon doubling mandate. That's moving considerably on just using that 800,000 acre feet for Water Quality Control Plan requirements. The lower court made no finding that implementation of the Water Quality Control Plan is duplicative of the water and the other needs that would be required to achieve the salmon doubling mandates, or indeed achieve any of the other restoration mandates of the CVPIA. It based its determination on the primary purpose issue on a completely different argument. It found that that section established an immutable ceiling on the total amount of CVP yield that can be provided to environmental purposes. This cannot be squared with the law, which indicates Congress intended just the opposite, to carve out a new pot of water for restoration, not to limit the CVP's total obligations under the statutes. Finally, I am all out of time, but I would request that if this court wants further briefing on the mootness issue, we think our briefs did address that, but in light of this new decision we would request an opportunity to provide briefings should the courts so require. Thank you. Thank you, Counsel. The case just heard is submitted. Thank you, Your Honor. Let's take a ten-minute recess. Thank you. Thank you. Thank you. You do have easels, huh? I thought you were giving that up. Thank you.
judges: Canby, Kleinfeld, Rawlinson